# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF FLORIDA
### (Tampa Division)

LEGION SYSTEMS, LLC,
a Florida limited liability company,

      Plaintiff,

v.                                    Case No.: 8:20-CV-02321

VALIANT GLOBAL DEFENSE SERVICES, INC.,
a Delaware corporation,

      Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Legion Systems, LLC, by and through undersigned counsel, sues Defendant, Valiant Global Defense Services, Inc., successor-in-interest to Cubic Global Defense, Inc., and alleges:

**I.  Parties, Jurisdiction and Venue:**

1.  Plaintiff, Legion Systems, LLC ("**Legion**"), is a Florida limited liability company with its principal place of business in Tampa, Hillsborough County, Florida. It is a "citizen" of the State of Florida for purposes of 28 U.S.C. §1332(c)(1).

2.  Defendant, Valiant Global Defense Services, Inc. ("**Valiant**"), is a Delaware corporation with its principal place of business in Virginia. It is a "citizen" of the State of Delaware and the State of Virginia for purposes of 28 U.S.C. §1332(c)(1). Valiant is the successor-in-interest to Cubic Global Defense, Inc. ("**Cubic**"). Valiant registered with the Florida Secretary State for the privilege to engage in business in the State of Florida and has been doing so at all material times. Valiant has appointed a registered agent in Florida to accept service of process on its behalf.

3. This Court has subject matter jurisdiction under 28 U.S.C. §1332 over each claim asserted herein because the citizenship of the parties is diverse and the amount in controversy in each claim exceeds $75,000.00 in compensatory damages sought by Legion.

4. This Court's exercise of personal jurisdiction over Valiant for purposes of this action does not offend due process principles of minimum contacts.

5. Venue is proper in this Court.

6. All conditions precedent to the relief requested herein have been satisfied or waived.

## II. The U.S. Army "MTCCS" Program:

7. Beginning in 2016, Cubic approached Legion about "teaming" with Cubic in its pursuit of a prime contract with the Army Contracting Command in Orlando, Florida. Cubic anticipated (correctly) that the Army Contracting Command would issue a Request for Proposals for Solicitation No. W900KK15R0052 Mission Training Complex Capability Support (the "**MTCCS Program**").

8. Cubic intended to submit a proposal to act as one of the prime contractors on the MTCCS Program. The MTCCS Program was a Multiple Award, Indefinite Delivery Indefinite Quantity ("IDIQ") contract with a ~ $975 million ceiling. More than one prime contract would be awarded, which would entitle those successful prime contractors to thereafter compete with each other for specific task orders issued during the multi-year term of the MTCCS Program.

9. The MTCCS Program included a small business participation goal of no less than twenty percent (20%) of the awarded work to qualified small businesses.

10. Cubic greatly desired to demonstrate in its solicitation that its team had capabilities, experience, and past performance at every Mission Training Complex ("**MTC**") location

encompassed in the MTCCS Program. The problem, however, was that Cubic did not. It lacked experience and past performance at a critical MTC in Hawaii. Cubic also required qualified small businesses to meet the Small Business Participation Plan requirements of the MTCCS Program.

11. Legion had critical capabilities and experience relevant for the MTCCS Program. Moreover, Legion had a track record of past and then-current performance at the MTC in Hawaii that Cubic lacked. Legion also qualified as a small business for purposes of satisfying Cubic's small business participation goal. Thus, having Legion as an identified subcontractor on its team ensured Cubic's proposal for the MTCCS Program included small business qualifications and demonstrated capability, experience and past performance across all MTC locations. On information and belief, Cubic was the only prime contractor candidate that could boast of experience and performance at every MTC.

12. Thus, to enhance its competitive position and likelihood of a favorable award, Cubic proposed that Legion team with Cubic to add Legion's qualifications, experiences and capabilities to Cubic's solicitation. If the teaming proved successful and Cubic was awarded a prime contract, the parties would negotiate a subcontract whereby Legion would provide work as a subcontractor under Cubic as the prime.

### III. The Teaming Agreement Between Cubic and Legion

13. So important to Cubic were Legion's small business qualification, capabilities, experiences, and past performance that Cubic demanded Legion agree to "be exclusive" in teaming with Cubic. Cubic insisted that Legion forego opportunities to simultaneously team at the solicitation stage with other prime contractor candidates competing with Cubic for an award under the MTCCS Program. In return, Cubic proposed to guarantee Legion a certain percentage of the

small business participation goal "work-share" under the MTCCS Program. That guarantee was unacceptable to Legion.

14. Legion limited its chances of becoming a subcontractor on the MTCCS Program by teaming with only one prime contractor candidate. Unless Legion was teamed with a particular prime contractor at the solicitation stage, it was understood by the parties that Legion stood little chance of subsequently becoming a subcontractor for that contractor should it be awarded a prime contract.

15. Legion therefore resisted Cubic's request to team exclusively with Cubic. Moreover, Legion insisted that it receive a guaranteed work-share of three percent (3%) of the *total* contract value "across all task orders" awarded to Cubic under the MTCCS Program, not just a percentage of the small business set aside work. Legion would be guaranteed to earn 3% of the total contract value of all task orders awarded to Cubic regardless of whether Cubic assigned work-share to Legion (thus, it was expected that Cubic would elect to allocate work-share to Legion).

16. To persuade Legion to team exclusively with it, on March 17, 2017, Cubic agreed to Legion's demand. Cubic represented: "We would not guarantee work share if Legion does not guarantee exclusivity, but we would guarantee 3% work share across the board, inclusive of Legion's incumbent work, for Legion's exclusivity." Legion agreed, provided the 3% guarantee was *exclusive* of incumbent work. Cubic thereafter agreed that the 3% guarantee was exclusive of the incumbent work, and that agreement was subsequently incorporated into Attachment A of an exclusive "Teaming Agreement" executed 10 days later on March 27, 2017. A copy of the Teaming Agreement is attached hereto as Exhibit 1. Legion signed the Teaming Agreement in reliance upon Cubic's guarantee of 3% work share across all task orders, as documented in Attachment A to the Teaming Agreement.

17. Although both parties participated in drafting the workshare and compensation provision of Attachment A, the Teaming Agreement was drafted by Cubic. Notably, the first version delivered to Legion for signature misstated in Attachment A that, if Cubic was awarded a prime contract, Legion shall receive ". . . 3% of SB [small business] goal across all Task Orders that Cubic pursues and wins." When Legion pointed out that contradicted the guarantee term of the agreement, Cubic acknowledged the mistake, described it as inadvertent, and then revised the provision to correctly provide:

> **Legion shall receive the following work-share allocations:**
>
> **100% of incumbent work.  3% of total contract across all Task Orders that Cubic pursues and wins.  Not inclusive of Legion Systems, LLC's incumbent work.**

That is the language that was ultimately incorporated in Attachment A of the executed Teaming Agreement. (Exhibit 1, at Attachment A).

18. Teamed exclusively with Legion, Cubic submitted its proposal for the MTCCS Program. Featured prominently was Legion's participation on the team and the aggregate capabilities, experience and past performance of the team existing only because of Legion's presence on it.

19. Ultimately, on or about November 15, 2017, the Army Contracting Command – Orlando awarded three full and open, unrestricted prime contracts for the MTCCS Program. Cubic was awarded one of the prime contracts.

IV. **The Subcontract between Cubic and Legion**

20. As planned, Cubic and Legion thereafter negotiated an "Indefinite Delivery/Indefinite Quantity" ("**IDIQ**") subcontract between them for the MTCCS Program (the

5

"**Subcontract**").  The Subcontract was executed effective February 22, 2018.  A copy of the Subcontract and a subsequent modification thereto is attached hereto as <u>Exhibit 2</u>.

21. The duration of the Subcontract is stated in Article 7, Period of Performance as follows:

> **The ordering period for this IDIQ Subcontract is projected to be: Date of award through 14 November 2022.**
>
> **The periof of performance for each Order shall be specified in the Order.**

22. The guarantee remained in force.  Attachment 5 of the Subcontract provides:

**Legion shall receive the following work-share allocations:**

> **100% of incumbent work.  3% of total contract across all Task Orders that Cubic pursues and wins.  Not inclusive of Legion Systems, LLC's incumbent work.**

23. Article 31 of the Subcontract provides that, irrespective of the place of performance, the Subcontract is governed by the federal common law of government contracts except to the extent that law is not dispositive, in which event it is governed by the law of the State of California without regard to its conflict of laws or choice of law provisions.

24. Article 55 of the Subcontract governing exclusivity provides, *inter alia*, that Legion and Valiant are bound on an exclusive basis for the scope of work set forth in Attachment 5 except to the extent other "suppliers" are needed to satisfy the requirements of the prime contract.  No such need existed or arose to use other suppliers or subcontractors to satisfy the requirements of the prime contract.

**V.     <u>Valiant succeeds Cubic as a party to the Subcontract</u>**

25. Shortly after the Subcontract was executed, Valiant purchased from Cubic its rights under the prime contract with Army Contracting Command - Orlando for the MTCCS Program.

Valiant became Cubic's successor-in-interest under the prime contract and under the Subcontract with Legion.

26. From the outset, Valiant wanted to itself perform the work-share in-house and thereby avoid paying Legion.

### V. Valiant extends, breaches and repudiates the Subcontract.

27. Valiant was ultimately awarded at least two task orders under the MTCCS Program with an aggregate contract value of ~ $211.6 million. Valiant did not allow Legion to bid on either of these task orders. Legion does not know the full extent of the task orders awarded to Valiant, because Valiant neglected or refused to share that information with Legion.

28. Later, Valiant *inadvertently* issued a request that Legion bid on a narrow, new requirement. When Valiant subsequently attempted to retract the request, Legion objected. Valiant relented and ultimately allocated that work to Legion, which totaled $598,082.00. The allocation of this limited work to Legion is reflected in a task order modification, dated August 2019. A copy of "Modification 1" is attached hereto as Exhibit 3. That was the only work-share allocated to Legion under the MTCCS Program.

29. Notwithstanding Valiant's limited allocation of work as reflected in the task order modification, it continued to refuse to allocate available work-share to Legion, despite Legion's reminders of the 3% guarantee to it. For its part, Legion at all material times remained ready, willing and able to perform under the Subcontract.

30. Not only did Valiant refuse to allocate available work-share to Legion, but Valiant also neglected or refused to inform Legion when and whether Valiant would pursue task orders. As a result, to the extent Valiant chose not to pursue a specific Task Order, or was not successful in winning the specific Task Order, Valiant kept Legion in the dark, causing Legion to miss any

opportunity to join another teammate for that Task Order, as specfically promised by the Subcontract at Attachment 5. Specifally, Subcontract Attachment 5 states as follows:

> **If Cubic does not pursue a specific Task Order, Legion may join another teammate for that Task Order. Additionally, if Cubic is not successful in winning a specific Task Order, Legion may pursue joining the winning Prime Contractor's team for that specific Task Order.**

31.  Eventually, as the MTCCS Program task order competitions progressed towards completion, it became the case that Valiant would be unable during the remainder of the program to allocate sufficient work-share to Legion to equal 3% of the total contract amount of all task orders awarded to Valiant. In short, by electing to perform Legion's work-share itself in-house and/or by using another subcontractor even though Legion was ready, willing and able to perform, Valiant put itself in a position that it would not be able to allocate work-share to Legion sufficient to fully credit the amount of the guaranteed payment to Legion.

32.  When Legion brought this to Valiant's attention, Valiant repudiated its obligation to allocate 3% of the work to Legion. Valiant also insisted that Legion renegotiate the Subcontract. This demand to renegotiate breached Valiant's promise that Legion would be guaranteed 3% of the total contract across all task orders. Legion refused to do so.

33.  On April 27, 2020, Legion requested a proposed payment schedule from Valiant to pay the guaranteed amount due to Legion. Valiant refused to propose a payment schedule and again repudiated its obligation under the Subcontract to pay Legion the amount equal to 3% of the total contract value across all task orders Valiant was awarded under the MTCCS Program.

34.  On information and belief, as of December 31, 2019, the total contract value of the task orders awarded to Valiant was ~ $82.9 million, not including any other task orders awarded to Valiant that Legion does not know about. Thus, Legion was entitled to payment of at least ~

$2.4 million under the Subcontract as of year-end 2019 (3% of $82.9 million). On information and belief, the estimated total contract value of those task orders through the completion of the MTCCS Program is ~ $211.6 million, meaning Legion is entitled to eventual payment of at least ~ $6.3 million (3% of $211.6 million) by the end of the program.

35. On May 11, 2020, Legion reminded Valiant of the vested amounts due to Legion and proposed a payment plan starting with a $2.0 million payment on or before June 30, 2020. Valiant refused and continued to repudiate its obligation to pay any guaranteed amount to Legion.

36. Over the course of Summer 2020, Legion continued its demands and attempted to obtain a commitment from Valiant to a payment plan. Valiant stood by its prior repudiation of its payment obligations under the Subcontract.

37. Notwithstanding its prior material breach and prior repudiation of its obligations under the Subcontract, on August 19, 2020, Valiant attempted to terminate the Subcontract "for convenience." Even if termination of the Subcontract was still an available contract option for Valiant *after* its material breach and unequivocal repudiation of its obligations, termination would have no effect on the guaranteed payment amount due to Legion under the Subcontract. Yet, Valiant refuses and continues to repudiate its obligation to pay the guaranteed amount to Legion.

38. On information and belief, Valiant has recently entered into another subcontract with a competitor of Legion at rates more favorable to Valiant. Moreover, Legion has allocated work to the subcontractor that is within the scope of Attachment 5 to the Subcontract between Legion and Valiant, and that Legion is ready, willing and able to perform.

## Count I
### (Breach of the Subcontract)

39. Legion realleges Paragraphs 1 – 38 above, as if set forth fully herein.

40. As successor-in-interest to Cubic, Valiant is obligated to perform the duties of the "Buyer" under the terms of the Subcontract. Those duties include: (1) allocating work-share to Legion in a minimum amount equal to 3% of the total contract across all task orders awarded to Valiant under the MTCCS Program or, alternatively, paying Legion an amount equal to 3% of the total contract across all Task Orders awarded to Valiant under the MTCCS Program, and (2) complying with the exclusivity provisions of Article 55 of the Subcontract.

41. Valiant breached the Subcontract by:

   a. failing and refusing to allocate work-share to Legion in a minimum amount equal to 3% of the total contract across all task orders awarded to Valiant under the MTCCS Program,

   b. failing, refusing and repudiating its obligation to pay Legion an amount equal to 3% of the total contract across all task orders awarded to Valiant under the MTCCS Program,

   c. insisting that Legion renegotiate the payment terms, in violation of the Subcontract's price guarantee,

   d. failing and refusing to comply with the exclusivity provisions of Article 55 of the Subcontract by electing to perform the work itself and/or by using another subcontractor.

42. Valiant's breaches of and repudiation of its duties under the Subcontract each constitute an independent and material breach of the Subcontract.

43. Legion, at all times and in good faith, complied with the terms of the Subcontract, and is owed the full amount of 3% of Valiant's prime contract across all task orders.

44. As a direct and proximate result of Valiant's breaches, Legion has been damaged.

WHEREFORE, Plaintiff, Legion Systems, Inc., demands judgment against Defendant, Valiant Global Defense Services, Inc., for damages in excess of $75,000.00, pre- and post-judgment interest, costs, and such other and further relief as may be just and proper.

## Count II
### (Breach of the Duty of Good Faith and Fair Dealing)

45. Legion realleges Paragraphs 1 – 38 above, as if set forth fully herein.

46. As successor-in-interest to Cubic, Valiant is obligated to perform the duties of the "Buyer" under the terms of the Subcontract.

47. The Subcontract includes an implied covenant of good faith and fair dealing that imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.

48. Legion had a reasonable expectation that Valiant would not act so as to destroy Legion's reasonable expection to be allocated 3% of the total contract across all task orders.

49. Valiant materially breached the duty of good faith and fair dealing by:

   a. withholding and refusing to allocate the guaranteed work-share to Legion,

   b. refusing and repudiating its duty to pay Legion an amount equal to 3% of the total contract across all task orders awarded to Valiant,

   c. insisting that Legion renegotiate less favorable terms under the Subcontract,

   d. electing to itself perform work-share that should have been allocated to Legion,

  e. allocating work that could and should be performed by Legion to another subcontractor,

  f. refusing or neglecting to inform Legion when it would pursue, or choose not to pursue a task order,

  g. refusing or neglecting to inform Legion when it won or lost a task order competition,

  h. scheming to deprive Legion of its right to receive benefits under the Subcontract, and

  i. engaging in conduct that is objectively unreasonable and evidences bad faith and ill will towards Legion.

50. Legion performed its duties under the Subcontract and stood ready, willing and able to continue to perform at all material times.

51. As a direct and proximate result of Valiant's breach of the duty of good faith and fair dealing, Legion has been damaged.

WHEREFORE, Plaintiff, Legion Systems, Inc., demands judgment against Defendant, Valiant Global Defense Services, Inc., for damages in excess of $75,000.00, pre- and post-judgment interest, attorneys' fees and costs, and such other and further relief as may be just and proper.

### Count III
### (Alternative Claim for Wrongful Termination of Contract)

52. Legion realleges Paragraphs 1 – 38 above, as if set forth fully herein.

53. As successor-in-interest to Cubic, Valiant is obligated to perform the duties of the "Buyer" under the terms of the Subcontract.

54. Valiant materially breached the Subcontract by improperly invoking the termination for convenience clause as a pretext for its true motive, which was to try to cover for its prior material breaches, and to get a better deal from a different subcontractor.

55. Legion performed its duties under the Subcontract and stood ready, willing and able to continue to perform at all material times and is owed the full amount of 3% of Valiant's prime contract across all task orders.

56. As a direct and proximate result of Valiant's breach of contract, Legion has been damaged.

WHEREFORE, Plaintiff, Legion Systems, Inc., demands judgment against Defendant, Valiant Global Defense Services, Inc., for damages in excess of $75,000.00, pre- and post-judgment interest, costs, and such other and further relief as may be just and proper.

### Count IV
**(Alternative Claim for Bad Faith Termination of Contract)**

57. Legion realleges Paragraphs 1 – 38 above, as if set forth fully herein.

58. As successor-in-interest to Cubic, Valiant is obligated to perform the duties of the "Buyer" under the terms of the Subcontract.

59. The Subcontract includes an implied covenant of good faith and fair dealing that imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.

60. Legion had a reasonable expectation that Valiant would not act so as to destroy Legion's reasonable expection to be allocated 3% of the total contract across all task orders.

61. Valiant materially breached the Subcontract in bad faith by improperly using the termination for convenience clause as a pretext for its true motive, which was which was to try to cover for its prior matieral breaches, and to get a better deal from a different subcontractor.

62. Valiant materially breached the Subcontract by abusing its discretion in its decision to terminate it, allegedly for "convenience" when its true motive was to try to cover for its prior material breaches, and to get a better deal from a different subcontractor.

63. Legion performed its duties under the Subcontract and stood ready, willing and able to continue to perform at all material times.

64. As a direct and proximate result of Valiant's breach of the duty of good faith and fair dealing, Legion has been damaged.

WHEREFORE, Plaintiff, Legion Systems, Inc., demands judgment against Defendant, Valiant Global Defense Services, Inc., for damages in excess of $75,000.00, pre- and post-judgment interest, reasonable attorneys' fees and costs, and such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

/s/ Ali V. Mirghahari
Mahlon Barlow
FL Bar No. 0871117
mbarlow@sbwlegal.com
mhbassistant@sbwlegal.com
Ali V. Mirghahari
Florida Bar No. 1003493
amirghahari@sbwlegal.com
avmassistant@sbwlegal.com

SIVYER BARLOW & WATSON.
401 E. Jackson Street, Ste. 2225
Tampa, FL  33602
Tel. (813) 221-4242
Fax: (813) 227-8598

-and-

Norah Molnar (to seek admission *pro hac vice*)
CORDATIS LAW LLP
1011 Arlington Blvd., Suite 375
Arlington, VA 22209
Phone: (202) 342-2550
nmolnar@cordatislaw.com