UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LEGION SYSTEMS, LLC,

    Plaintiff,

v.                                                              Case No. 8:20-cv-2321-KKM-MRM

VALIANT GLOBAL DEFENSE SERVICES, INC.,

    Defendant.
_____

**PRETRIAL ORDER**

An axiomatic rule of contract law requires courts to read contracts as a whole, "according reasonable meaning to all of the contract terms" and rendering no term superfluous. *Lockheed Martin IR Imaging Sys., Inc. v. West*, 108 F.3d 319, 322 (Fed. Cir. 1997); *see also MacKinnon v. Truck Ins. Exch.*, 73 P.3d 1205, 1213 (Cal. 2003) (subsequent history omitted). The Subcontract at issue here includes an attachment, referenced in Article 55 of the Subcontract, that guarantees Legion Systems 3% of Valiant Global Defense Services' workshare under a Prime Contract between Valiant and the U.S. Army. Subcontract (Doc. 26-3) art. 55, Attach. 5. Legion contends that this provision guarantees it 3% of Valiant's workshare, Legion Trial Br. (Doc. 145) at 29; Valiant argues that Legion is not guaranteed any minimum workshare based on other provisions in the

Subcontract, Valiant Trial Br. (Doc. 144) at 19–30, 49–56. In short, Valiant argues that the 3% workshare promised in Attachment 5 is meaningless or, if it ever had meaning, should be disregarded because it is inconsistent with higher-order provisions. But because there is a reading of the Subcontract that gives reasonable meaning to the 3%-workshare guarantee as well as reasonable meanings to the other clauses, I reject Valiant's reading and hold that Valiant was obligated to honor the 3%-workshare guarantee in Attachment 5.

I.  **BACKGROUND**

Legion Systems, LLC, a subcontractor, sued Valiant Global Defense Services, Inc., a prime contractor holding a five-year indefinite delivery/indefinite quality (IDIQ) contract supporting the U.S. Army's Mission Training Complex Capability Support (MTCCS) Program. Joint Pretrial Statement (Doc. 138) at 2. The Army originally awarded the IDIQ contract to Cubic Global Defense, Inc., and Valiant inherited the contract as Cubic's successor-in-interest. *Id.* at 3. Valiant's Prime Contract with the Army guaranteed that the Army would provide Valiant with a $2,000 minimum order. Valiant Trial Br. at 15. This minimum order was simply a payment, not an order for work. *Id.* To obtain workshare, Valiant would have to compete against other prime contractors for task orders from the Army. *Id.* Legion's Subcontract with Valiant provides that Legion will assist Valiant in fulfilling task orders that Valiant secures. *See generally* Subcontract.

2

Legion's operative complaint against Valiant alleges two breach-of-contract claims and two breach-of-the-duty-of-good-faith (or "bad-faith") claims. Am. Compl. (Doc. 26) ¶¶ 42–66. The first breach-of-contract claim and the first bad-faith claim relate to the 3%-workshare guarantee found in Attachment 5 of the Subcontract. *Id.* ¶¶ 42–54. Attachment 5 provides:

> Legion shall receive the following work-share allocations: 100% of incumbent work. 3% of the total contract across all Task Orders that [Valiant] pursues and wins. Not inclusive of Legion Systems, LLC's incumbent work.

Subcontract at Attach. 5. Additionally, Article 55 of the Subcontract provides, in relevant part:

> For the duration of this Agreement, the Parties shall be bound on an exclusive basis for the scope of work set forth in Attachment 5, and shall not participate in any effort, individually or jointly with any third party, to offer to the Customer, the U.S. Government, or any third party any proposal with respect to the Program covered hereunder, or enter into any agreement with any such third party with respect to said Program; provided, however, that [Valiant] shall not be precluded from teaming with other third parties for other work under the Program (i.e., [Valiant] may have additional subcontractor teammates), or for the same scope of work to the extent other suppliers are needed to satisfy the requirements of the Prime Contract (e.g., small business requirements, geographic requirements). . . .

*Id.* art. 55.

Legion argues that Attachment 5 and Article 55 together require Valiant to award Legion a minimum of 3% of its workshare across all task orders that Valiant pursues and wins under the Prime Contract with the Army. Legion Trial Br. at 29. Count I of Legion's complaint alleges that Valiant breached the Subcontract by failing to award Legion 3% of

3

Valiant's workshare and requesting that Legion renegotiate the workshare-guarantee provision. Am. Compl. ¶ 44. Count II of Legion's complaint alleges that Valiant violated its implied duty of good faith and fair dealing by failing and refusing to award Legion 3% of the workshare. *Id.* ¶ 52.

Notwithstanding the workshare provision, Valiant argues that it was not obligated to grant Legion 3% of its workshare under the Prime Contract. Valiant Trial Br. at 19–30, 49–56. Specifically, Valiant cites Article 6 of the Subcontract, which provides:

> For the purpose of Government audit only, the initial ceiling value of this Subcontract is estimated at $750,000. However, the maximum value of this Subcontract is equal to the sum of all Orders awarded. The ceiling value will be adjusted accordingly. There is no commitment on the part of Buyer to expend a maximum or minimum value during the term of this Subcontract. Buyer's total liability shall not exceed the amount awarded within each Order.

Subcontract art. 6. Valiant argues that this provision is irreconcilable with Attachment 5 because it clearly states that "[t]here is no commitment on the part of Buyer to expend a maximum or minimum value during the term of this Subcontract." *Id.*; Valiant Trial Br. at 50–51. Valiant also notes that the Subcontract's order-of-precedence clause prioritizes Article 6 above Attachment 5, in the event of a conflict. Subcontract art. 52. Valiant also claims that Attachment 5 is inconsistent with, and superseded by, several other provisions in the Subcontract, including Articles 1, 11, 15, and 30; Federal Acquisition Regulations incorporated by Article 25; and pages 4 to 5 of the Subcontract, which is broadly labeled

4

the Subcontract's "Agreement." Valiant Trial Br. at 19–30, 49–56; Subcontract at 5–6, 81, 86, arts. 1, 11, 15, 25, 30.[1]

A bench trial is scheduled to begin on July 24, 2023. At the pretrial conference on June 29, 2023, the parties requested that I resolve the workshare-guarantee question before trial. Pretrial Conference Tr. (Doc. 146) at 52:23–54:14. This Order resolves that dispute.

## II. ANALYSIS

### A. Article 55 and Attachment 5 Do Not Conflict with Article 6

Valiant emphasizes that Article 6 trumps Attachment 5's directive via the order-of-precedence clause. Valiant Trial Br. at 49–51. The clause states, in-full:

> Any inconsistency in this Subcontract shall be resolved by giving precedence in the following descending order: (a) these Articles 1-56; (b) Attachment 4; (c) Attachment 1; (d) Attachment 3; (e) individual Orders; (f) Attachment 2; and (g) Attachment 5.

Subcontract art. 52. But the order-of-precedence clause is relevant only when there is an "inconsistency" in the Subcontract. *Id.*; *see also Sperry Corp. v. United States*, 845 F.2d 965, 968 (Fed. Cir. 1988) (holding that it is unnecessary to resort to an order-of-precedence clause if the contract's provisions are consistent); *cf. Epic Commc'ns, Inc. v. Richwave Tech., Inc.*, 188 Cal. Rptr. 3d 844, 853 (Cal. Ct. App. 2015) ("Where two contract provisions conflict, the 'resulting repugnancy . . . must be reconciled, if possible,

---

[1] All pinpoint citations to the Subcontract are based on the pagination assigned by the Middle District of Florida's CM/ECF system.

5

by such an interpretation as will give some effect to the repugnant clauses, subordinate to the general intent and purpose of the whole contract.' " (quoting Cal. Civ. Code § 1652) (cleaned up)). A contract's provisions are "inconsistent" if the provisions "[l]ack[] agreement," or are "not compatible." *Inconsistent*, Black's Law Dictionary (11th ed. 2019). Because Article 6, Article 55, and Attachment 5 can be read compatibly and therefore are not inherently inconsistent, I need not employ the order-of-precedence clause.

Attachment 5 guarantees that Legion will receive 3% of the workshare that Valiant pursues and wins under the Prime Contract. Subcontract at Attach. 5 ("Legion shall receive the following work-share allocations: . . . 3% of the total contract across all Task Orders that [Valiant] pursues and wins."). Valiant, however, contends that Attachment 5 itself revokes this workshare guarantee because Attachment 5 also states that Legion's workshare "will be based on the Government's specific scope of work for the program . . . and Legion's ability to offer and provide personnel/capabilities within a competitive price range that will best meet the qualifications and satisfy the Government's requirements." *Id.*; Valiant Trial Br. at 29. These two provisions can flow naturally together: Attachment 5 guarantees Legion a minimum of 3% of the workshare, but any workshare beyond 3% depends on Legion's capabilities and pricing and the government's needs. The Subcontract identifies itself as an IDIQ subcontract, Subcontract at 5, and IDIQ subcontracts usually guarantee the seller a minimum workshare even though additional workshare is possible. *See, e.g.*, 48

6

C.F.R. § 52.216-22 (noting that even for an "indefinite-quantity contract," the buyer "shall order at least the quantity of supplies or services designated in the Schedule as the minimum").

Additionally, Article 55 of the Subcontract provides that "the Parties shall be bound on an exclusive basis for the scope of work set forth in Attachment 5," and Valiant may only partner with other companies to take part of Legion's "scope of work to the extent other suppliers are *needed* to satisfy the requirements of the Prime Contract (e.g., small business requirements, geographic requirements)." Subcontract art. 55 (emphasis added). In other words, Article 55 reaffirms Valiant's obligation to give Legion 3% of the workshare, except if Valiant cannot fulfill its obligations under the Prime Contract while awarding Legion 3% of the workshare. *Id.*

Conversely, Valiant argues that Attachment 5 conflicts with Article 6, which provides, in relevant part, "[T]he maximum value of this Subcontract is equal to the sum of all Orders awarded . . . There is no commitment on the part of Buyer to expend a maximum or minimum value during the term of this Subcontract. Buyer's total liability shall not exceed the amount awarded within each Order." *Id.* art. 6. Valiant argues that resorting to the order-of-precedence clause is necessary because the 3%-workshare provision prescribes a guaranteed minimum "value" that Valiant must pay under the Subcontract. Valiant Trial Br. at 50. But it is possible to read both provisions in harmony

7

without rendering Attachment 5 meaningless, which I must do. *Lockheed Martin IR Imaging*, 108 F.3d at 322; *Sperry Corp.*, 845 F.2d at 968; *MacKinnon*, 73 P.3d at 1213; *Epic Commc'ns*, 188 Cal. Rptr. 3d at 853. To be sure, Article 6 makes sense in the light of Valiant's own contract with the Army, which did not guarantee Valiant any work. Valiant Trial Br. at 15. Article 6 protects Valiant to the extent that Valiant did not acquire any task orders from the Army, but Attachment 5 nonetheless requires Valiant to provide Legion with 3% of the workshare that Valiant won under the Prime Contract.

Of note, the last sentence of Article 6 provides that Valiant's "total liability shall not exceed the *amount* awarded within each Order," and Article 1 defines "Order" as "a Delivery/Task Order issued by Buyer [Valiant] to Seller [Legion] hereunder." *See* Subcontract arts. 1, 6 (emphasis added). This sentence must be construed in the light of the preceding sentence in Article 6, which provides "There is no commitment on the part of Buyer to *expend* a maximum or minimum *value* during the term of this Subcontract." Subcontract art. 6 (emphasis added). Article 6 speaks in terms of Legion's monetary liability, not Legion's obligation to provide workshare. The plain terms of Article 1 and Article 6 together suggest that Article 6 attempts to limit Valiant's monetary liability to the amount awarded within each task order issued from Valiant to Legion. And even if Article 6 limits Valiant's monetary liability, that does not overrule Valiant's obligation to provide Legion with 3% of its workshare under the Prime Contract. *Id.* Indeed, limits on

8

monetary liability are designed to cap the damages of obligors that have forsaken their obligations under a contract. *See, e.g.*, 48 C.F.R. § 52.216-24(b) (prescribing "a maximum amount for which the Government shall be liable if [a] contract is terminated"); *Lewis v. YouTube, LLC*, 197 Cal. Rptr. 3d 219, 224–25 (Cal. Ct. App. 2015).

The parties requested a pretrial order resolving only the workshare-guarantee question, not the liability-limit question under Article 6. That is all this order decides. The above discussion simply explains why Article 6 does not necessarily revoke Valiant's workshare obligations even if it limits Valiant's monetary liability.

### B. No Other Higher-Ranked Provision Undoes Attachment 5

Valiant also argues that Attachment 5 conflicts with several provisions that the order-of-precedence clause ranks higher. But all these provisions are reconcilable with the workshare guarantee.

#### 1. Articles 1, 11, and 15 Do Not Conflict with Attachment 5

Valiant argues that Articles 1, 11, and 15 conflict with Attachment 5 because they prove that Legion had to perform work to be entitled to payment. Valiant Trial Br. at 52. Article 15 conditions payment to Legion on "actual tender of timely, conforming Work." Subcontract art. 15. And Article 1 defines "Work" as "the goods, software, technical data, services, and other items that Seller will be required to deliver/perform in response to individual Orders issued by Buyer." *Id.* art. 1. Also, Article 11 provides, "Seller shall strictly

adhere to the delivery schedule specified in each Order. Seller's failure to do so shall constitute a material breach of the Order and this Subcontract." *Id.* art. 11.

None of these provisions conflict with the workshare guarantee contained in Attachment 5. Article 15 conditions payment to Legion on the tender of timely, satisfactory work, but that does not revoke Valiant's obligation to provide 3% of its workshare to Legion. It simply means that Legion must perform adequately to be entitled to payment for the work that it is assigned. Also, Legion's obligation to adhere to the schedule in each task order does not revoke the workshare guarantee—it instead defines any failure by Legion as a "material breach."

### 2. Applicable FAR Provisions, Incorporated through Article 25, Do Not Undo Attachment 5

The Subcontract also incorporates Federal Acquisition Regulations (FAR) that are listed in Attachment 3. *See id.* art. 25, Attach. 3. Because FAR provisions normally apply to contracts between the U.S. government and private parties, Article 25 clarifies that any reference to the "Government" refers to Valiant and any reference to the "Contractor" refers to Legion. *Id.* art. 25. The order-of-precedence clause prioritizes the incorporated FAR provisions over Attachment 5's workshare guarantee. *Id.* art. 52. Valiant argues that two FAR provisions are inconsistent with Attachment 5 and therefore nullify the latter provision. Valiant Trial Br. at 20–23.

First, Valiant cites FAR 52.216-22, which states:

(a) This is an indefinite-quantity contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies and services specified in the Schedule are estimates only and are not purchased by this contract.

(b) . . . [Valiant] shall order at least the quantity of supplies or services designated in the Schedule as the minimum.

48 C.F.R. § 52.216-22. Valiant argues that FAR 52.216-22(a) clarifies that any guarantee of work in the workshare provision is an "estimate[] only" and is "not purchased" by subcontract. Valiant Trial Br. at 21–22.

Assuming *arguendo* that the term "Schedule" in FAR 52.216-22(a) references Attachment 5, the workshare guarantee remains enforceable because it can be read consistently with that provision. FAR 52.216-22(b) guarantees that Valiant "shall order at least the quantity of . . . services designated in the Schedule as the minimum." 48 C.F.R. § 52.216-22; *Howell v. United States*, 51 Fed. Cl. 516, 523 (2002) ("Here, the contracts contained the FAR-mandated indefinite-quantity clause, obligating defendant to order *some* minimum quantity of plaintiff's services." (discussing 48 C.F.R. § 52.216-22)); *Schweiger Constr. Co. v. United States*, 49 Fed. Cl. 188, 194 (2001) ("It is true that in an indefinite-quantity contract, the government is obligated to order the stated minimum quantity." (discussing 48 C.F.R. § 52.216-22)). Indeed, all IDIQ contracts must guarantee a "minimum" quantity to be valid. *See Willard, Sutherland & Co. v. United States*, 262

11

U.S. 489, 493 (1923) (holding that a contract was unenforceable due to "lack of consideration and mutuality" because it provided that the government was not obligated to order "any specific quantity"); *Howell*, 51 Fed. Cl. at 523 ("Since the Supreme Court decided *Willard* in 1923, however, Congress authorized promulgation of FAR 52.216–22 ("indefinite-quantity clause") which must be included in the government's indefinite-quantity contracts and requires the government to order 'the quantity of supplies or services designated . . . as the minimum.' " (quoting 48 C.F.R. § 52.216–22(b))). That minimum here is 3% of the workshare. FAR 52.216-22(a), in turn, clarifies that the "services specified in the Schedule are estimates only and *are not purchased by this contract*." (emphasis added). In other words, even though the Subcontract itself does not purchase Legion's services, the Subcontract guarantees that Valiant *will* purchase the minimum quantity of services specified, namely 3% of Valiant's workshare.

Next, Valiant cites FAR 52.216-24. Valiant Trial Br. at 22–23. As amended in Attachment 3, FAR 52.216-24 provides:

> (a) In performing this contract, the Contractor is not authorized to make expenditures or incur obligations exceeding _____ dollars. **TBD by individual Task Orders**
>
> (b) The maximum amount for which the Government shall be liable if this contract is terminated is _____ dollars. **TBD by individual Task Orders**

Subcontract at 86; *see also* 48 C.F.R. § 52.216-24. Valiant argues that these provisions undermine Attachment 5 by providing that "Legion could only perform work [that]

12

Valiant assigned via specific task orders," and establishing "a maximum amount of Valiant's liability in the event the Subcontract was terminated." Valiant Trial Br. at 22.

Neither of these sub-provisions undo the workshare guarantee. The fact that Legion was authorized to work only on assigned task orders does not undermine Valiant's obligation to assign task orders to Legion in the first place. Additionally, a limitation on Valiant's liability if the Subcontract "is terminated" does not undo Valiant's obligation to provide Legion with 3% of Valiant's workshare. *Id.* Indeed, a liability limit protects Valiant only if Valiant is otherwise liable for breaching its obligations under the contract. As noted above, I do not resolve the liability-limit question in this Order, and I discuss the liability limit to the extent relevant to the workshare-guarantee question.

### C. The "Agreement" Section of the Subcontract, which is not Addressed in the Order-of-Precedence Clause, Is Consistent with Attachment 5

Valiant relies heavily on statements in the "Agreement" section of the Subcontract, which is contained in the first few pages of the Subcontract and precedes the Subcontract's Articles and Attachments. *See* Subcontract at 5–6. Importantly, the Agreement is not mentioned in the order-of-precedence clause:

> Any inconsistency in this Subcontract shall be resolved by giving precedence in the following descending order: (a) these Articles 1-56; (b) Attachment 4; (c) Attachment 1; (d) Attachment 3; (e) individual Orders; (f) Attachment 2; and (g) Attachment 5.

13

Subcontract art. 52. At the summary-judgment stage, both parties agreed that the Agreement was part of the Subcontract, *see* Valiant's Mot. Summ. J. (Doc. 81) at 11–14; Legion's Resp. to Mot. Summ. J. (Doc. 95) at 10–11, but it is unclear precisely how the order-of-precedence clause interacts with the Agreement if the Agreement conflicts with Attachment 5 (or any other provision referenced in the order-of-precedence clause). One thing is clear: The order-of-precedence clause does not prioritize the Agreement before Attachment 5.

> Valiant cites the following language from the Agreement:
>
> Under this ID/IQ Subcontract, Seller may be required to deliver goods, software, and technical data and to perform related services (collectively, "Work") to Buyer in accordance with the terms and conditions set forth of this Subcontract and subsequently issued individual Delivery/Task Orders ("Orders").
>
> The Parties acknowledge and agree that Buyer's ability to allocate Work to Seller is dependent on: (a) the total amount of work actually ordered by the Government under the Prime Contract; and (b) satisfactory performance of Work by Seller in accordance with the terms of this Subcontract. There is no guaranteed minimum of Work hereunder that Buyer will issue to Seller after both Parties have executed this Subcontract beyond an initial Order.

Subcontract at 5. Valiant argues that the Agreement clarifies that Legion is guaranteed nothing beyond an initial task order, which in Valiant's view, overrules the 3%-workshare guarantee. Valiant Trial Br. at 51. Valiant also notes that the Agreement identifies the Subcontract as an IDIQ contract and IDIQ workshare guarantees are usually miniscule.

14

*Id.* For example, Valiant was guaranteed only a minimum order of $2,000 under its IDIQ contract with the Army. *Id.* at 15, 51.

For several reasons, Valiant's interpretation of the Agreement is not persuasive. First, Valiant's reading conflicts with Valiant's own interpretation of Article 6. Valiant argues that Article 6 clarifies that Legion is not guaranteed *any* minimum workshare but then argues that the Agreement guarantees Legion one task order. *Compare* Valiant Trial Br. at 51 ("Under the terms of this 'Agreement' portion of the Subcontract, Valiant was not required to assign work to Legion other than an 'initial Order.'"), *with id.* (arguing that Attachment 5 is unenforceable because "Article 6 sets 'no minimum value' to be assigned to the Subcontract"). Both interpretations cannot be true at once. Valiant's failure to reconcile its own interpretations of the Subcontract's provisions suggest that either one, or both, of Valiant's interpretations of the Agreement and of Article 6 is incorrect.

Second, the Agreement can be interpreted consistently with Attachment 5. Valiant emphasizes that the Agreement states, "[t]here is no guaranteed minimum of Work hereunder that Buyer will issue to Seller after both Parties have executed this Subcontract beyond an initial Order." Valiant Trial Br. at 24, 51 (citing Subcontract at 5). Read in isolation, this language seems to limit Legion's guaranteed workshare to an initial order. But governing law requires that I read contracts—including less-than-perfectly-drafted contracts—as a whole, not in isolation. *Lockheed Martin IR Imaging*, 108 F.3d at 322;

15

*MacKinnon*, 73 P.3d at 1213. Attachment 5 plainly guarantees Legion 3% of Valiant's workshare under the Prime Contract, Subcontract at Attach. 5, and the order-of-precedence clause does not mention the Agreement at all, much less prioritize the Agreement before Attachment 5. *Id.* art. 52. But more importantly, the Agreement's no-guarantee language is not necessarily inconsistent with the 3%-workshare guarantee when viewed in its full context:

> The Parties acknowledge and agree that Buyer's ability to allocate Work to Seller is dependent on: (a) the total amount of work actually ordered by the Government under the Prime Contract; and (b) satisfactory performance of Work by Seller in accordance with the terms of this Subcontract. There is no guaranteed minimum of Work hereunder that Buyer will issue to Seller after both Parties have executed this Subcontract beyond an initial Order.

Subcontract at 5. The sentence preceding the no-guarantee language clarifies that Valiant's ability to award Legion workshare is dependent on whether the government awards Valiant workshare and whether Legion performs satisfactory work. In the light of this context, the no-guarantee provision makes sense. Like Article 6, the Agreement reflects the contingent nature of Valiant's ability to award any workshare to Legion; namely, whether Valiant itself secures task orders under the Prime Contract. The workshare provision also allows Valiant to refuse to give workshare beyond an initial order if Legion fails to perform satisfactory work. But to the extent Legion performs adequately and Valiant is awarded workshare by the Army, Valiant must provide Legion with 3% of Valiant's workshare under the Prime Contract.

16

Third, Valiant emphasizes that the Agreement labels the Subcontract as an IDIQ subcontract, and that IDIQ subcontracts normally guarantee minimal workshare, not 3% of the workshare. Valiant Trial Br. at 51. This argument fails for several reasons. First, Valiant does not prove that the industry custom is to guarantee only limited workshare because Valiant cites only its Prime Contract with the Army as an example. *Id.* More importantly, industry custom cannot overcome the plain language of the Subcontract, which unambiguously guarantees Legion 3% of Valiant's workshare. *See* Subcontract art. 55, Attach. 5. Finally, even though the Agreement identifies the Subcontract as an IDIQ subcontract, *id.* at 5, that label alone does not override the Subcontract's text. *Cf.* Subcontract art. 34 ("The title or headings of the various paragraphs hereof are intended solely for convenience or reference and are not intended and shall not be deemed to modify or explain any of the provisions of this Subcontract."); ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 222 (2012) ("[A] title or heading should never be allowed to override the plain words of a text."). And to the extent that the IDIQ label is relevant, industry custom is that obligors must honor workshare guarantees in IDIQ subcontracts. *See* 48 C.F.R. § 52.216-22(a)–(b) ("This is an indefinite-quantity contract . . . The Government shall order at least the quantity of supplies or services designated in the Schedule as the minimum."); *Howell*, 51 Fed. Cl. at 523; *Schweiger Constr. Co.*, 49 Fed. Cl. at 194.

17

Overall, nothing in the Agreement is inconsistent with Attachment 5. And even if the Agreement was inconsistent with Attachment 5, Valiant has not shown through the language of the Subcontract why the Agreement would nullify Attachment 5 under the order-of-precedence clause.

## III.  CONCLUSION

Valiant's reading of the Subcontract's workshare guarantee cannot be correct because Valiant's interpretation gives no effect to Attachment 5 and fails to coherently reconcile ostensible inconsistencies in the Agreement and Article 6. Valiant's theory is that the 3% guarantee was little more than ink on paper, and that Legion would have discovered the guarantee's false promise if it read the Subcontract closely enough. I am not persuaded that is the best reading of the Subcontract as a whole. As Attachment 5 plainly states, Legion is promised a workshare equal to "3% of the total contract across all Task Orders that [Valiant] pursues and wins." Subcontract at Attach. 5.[2]

---

[2] At the summary-judgment stage, Valiant also argued that the Court should consider Cubic's and Legion's Teaming Agreement—which Valiant conceded is extrinsic evidence—to interpret the Subcontract. Valiant's Mot. Summ. J. (Doc. 82) at 17–18. Cubic and Legion executed the Teaming Agreement on March 26, 2017, while Cubic was bidding for the Prime Contract with the Army. Joint Pretrial Statement at 22. Valiant argued that the Teaming Agreement demonstrates that Valiant (as Cubic's successor in interest) agreed only to provide Legion workshare on task orders related to three programs: III Corps, XVIII Airborne Corps, and USARPAC. Valiant's Mot. Summ. J. at 17–18. I need not address this argument for three reasons. First, Valiant did not reassert this argument in its trial brief. *See generally* Valiant Trial Br. Second, Valiant waived this argument at the pretrial conference by arguing that the plain language of the contract spoke for itself and that I need not consider extrinsic evidence to interpret the subcontract. Pretrial Conference Tr. at 13:25–14:7. Finally, even if this argument was preserved, it is foreclosed by the plain language of Attachment 5, which guarantees Legion "3% of the total contract across *all Task Orders* that [Valiant] pursues and wins." Subcontract at Attach. 5 (emphasis added). Extrinsic evidence cannot undo the plain text of a contract.

18

**ORDERED** in Tampa, Florida, on July 17, 2023.

*Kathryn Kimball Mizelle*
Kathryn Kimball Mizelle
United States District Judge